FRIES et al. v. LEEMING et al.

(Circuit Court, E. D. New York. August 12, 1904.)

1. PATENTS—INFRINGEMENT—VESSELS FOR ADMINISTERING VOLATILE LIQUIDS.

The Monnet patent, No. 604,191, for improved vessels for containing and administering volatile liquids, consisting of a glass body adapted to be held in the hand, whereby the heat of the hand can volatilize the liquid and generate an internal pressure, and having two or more integral necks, each with a capillary orifice for discharging the liquid in a jet or spray, and each neck surrounded by a collar and inclosed by a cap, was not anticipated, and discloses patentable invention. Claim 6 also *held* infringed.

In Equity. This cause comes here upon pleadings and proofs. It is the usual suit in equity for infringement of letters patent No. 604,191, May 17, 1898, to P. P. Monnet, for improvements in vessels for containing and administering volatile liquids.

Arthur C. Fraser and Joseph A. Stetson, for complainants
Dickerson, Brown & Raegener, for defendants.

LACOMBE, Circuit Judge. The application was filed August 8, 1896, but it took the place of a similar application then abandoned, which carries the date back to March 6, 1895, when the earlier application was filed. The specification states that the invention—

"has reference to vessels for containing and administering volatile liquids, and particularly chloride of ethyl, chloride of methyl, and other liquids of a very volatile nature; and its objects are to manufacture vessels in which such liquids can be conveniently carried, which will preserve them without altera- tion, which can be conveniently handled, and which will allow of their liquid contents being projected therefrom in the form of vapor or spray, or in the form of a liquid jet, and administered in a safe, practical, and simple manner, in fractional or measured quantities. The means employed for delivering the liquids is the heat of the human hand holding the vessel, or the heat of the atmosphere when the temperature is sufficient. Vessels as hitherto constructed for containing volatile liquids, and for delivering therefrom by the heat of the hand or of the atmosphere, have had a single neck or nozzle, with a capillary or very fine outlet-orifice, hermetically closed either by being sealed off, or by means of a stretched rubber band, or of a cap or other device by which the orifice can be opened and closed at will, and allow any desired portion of the contents to be used at one time. Because these vessels have only one outlet- orifice, it is not practicable to refill them. Again, the delivery from their orifice must always be practically the same in a given time, and always in the same direction relatively to the body of the vessel. Now, with vessels constructed according to my invention, refilling can be readily effected; the delivery can be varied in amount during a given time, and can take place in a variety of directions, relatively to the body of the vessel. A single vessel will thus serve the purpose of a set of vessels, such as dentists or others now provide them- selves with. The invention consists in the combination, with the body of a vessel for containing and administering volatile liquids, and adapted to be grasped by the hand, of two or more necks projecting from said body in differ-

ent directions, and each of them provided with a capillary outlet-orifice, which is normally closed by suitable closing device."

Some other features of the invention which have no relevancy to this case are recited, and the specification then refers to the drawings, of which one only need be reproduced. Others show the outlet orifices arranged so as to point in different directions—some axially; some at an angle with the body of the vessel.

The specification proceeds:

"Referring to Fig. 1, the vessel there shown for containing volatile liquid is in the form of a glass tube, A, terminating at its two ends in tubular necks, a, a', formed with capillary passages, b, b'. Each of these passages is hermetically closed by a removable metallic cap, B, fitting by means of a bayonet-joint on a metallic collar, C, mounted on the corresponding neck, a, or a'. The cap, B, is provided with an elastic packing, c—such for instance, as a rubber ring or washer—adapted to bear against the orifice of the passage in the tubular neck. It will be readily understood that a vessel of this kind may be refilled with volatile liquid as many times as desired, the arrangement being such that, when it is immersed in the liquid in such a manner as to cause the liquid to enter through one of the passages, b, or b', the orifice of the other passage may be held out of the liquid, so as to allow the air contained in the vessel to escape. * * * In the modification shown in Fig. 2, the tubular neck, a', instead of being in line with the neck, a, as is the case with the neck, a' in Fig. 1, is bent or curved to one side; the orifices of these necks being, however, closed by metallic caps with an internal elastic packing, in the same manner as is the case in Fig. 1."

The defendants' device is, in form, a reproduction of Fig. 2. Infringement is charged of the following claims:

"(1) The improved vessel for containing, vaporizing, and administering volatile liquids under internal pressure, consisting of a vessel-body of such size and form that it may be grasped by and inclosed in the hand, having a plurality of necks projecting from said body in different directions, and having a plurality of capillary outlet-orifices, one in each of said necks, and closing devices for said orifices, whereby either of said orifices can be opened for ejecting the liquid, and said vessel can be refilled when both said orifices are open, substantially as set forth."

"(4) The improved vessel for containing, volatizing, and administering volatile liquids under internal pressure, consisting of a thin glass body adapted to be grasped by and inclosed in the hand, whereby the heat of the hand can volatilize the contents of the vessel for generating an internal pressure therein, such vessel having an integral neck having a capillary orifice, opening at its outer end, an external metal collar fixed on and surrounding said neck, and a cap closing said orifice, embracing the end of said neck, and held thereon by said collar."

"(6) The improved vessel for containing, volatilizing, and administering volatile liquids under internal pressure, consisting of a glass body adapted to be held in the hand, whereby the heat of the hand can volatilize the liquid and generate an internal pressure in the vessel, having two integral necks, having capillary orifices traversing and opening at the end of each neck, an outer metal collar surrounding and fixed to each neck, and a cap for each neck closing the orifice therethrough, inclosing the end of the neck, and engaging the collar thereon."

"(7) In vessels for containing, volatilizing, and administering volatile liquids, a vessel-body for containing the liquid, adapted to be grasped by and inclosed in the hand, whereby the heat of the hand can volatilize the liquid to generate an internal pressure, said body having two independent outwardly-projecting necks, the one angular in its projection relatively to the other, capillary orifices traversing and opening through said necks, respectively, fastenings on the exteriors of said necks, and caps for closing said orifices, enveloping the ends of said necks, respectively, and held thereon by said fastenings, whereby the liquid can be discharged in different directions relatively to the longitudinal axis of said body."

"(8) The improved vessel for containing, volatilizing, and administering volatile liquids under internal pressure, consisting of a vessel-body of suitable size and form to be grasped by and inclosed in the hand, whereby the heat of the hand can be used to volatilize the liquid for generating an internal pressure in the vessel, having two necks, the one axial and the other angular in extension, relatively to the longitudinal axis of the body, a capillary orifice traversing and opening through each of said necks, fastenings on the exteriors of said necks, respectively, and caps for closing said orifices, and enveloping the ends of said necks, respectively, and held thereon by said fastenings."

From the above excerpts it will be perceived that improvements principally relied on by the patentee were the plurality of necks, and the arrangement of one of them at an angle to the axis of the vessel. It may fairly be questioned whether invention can be found in the mere duplication of an existing neck, or in merely changing its direction so as to facilitate the administering of its contents. There is, however, another feature of the device which is very plainly pointed out in the specification, and embodied in some of the claims. Where the history of the art indicates that such feature is novel and useful, was not found, though improvements were long sought for, and has commended itself to those who use such devices, the patent may be sustained, although the patentee did not enumerate it in his statement of invention.

The vessels which the patentee sought to improve are used in operations of minor surgery, including dental operations, for applying a highly volatile liquid to freeze the flesh, and thereby anæsthetize it. The liquid is administered in the form of a jet directed against the surface to be frozen. Ethyl chloride is the liquid usually administered. The vessel is of a shape and size convenient to be held in the hand, the heat thus applied volatilizes the contents, which boils at 50° F., and generates sufficient pressure within the tube to expel a portion of the liquid in a minute jet through any orifice which may be provided. It is, of course, essential that when not in use the orifice shall be hermetically sealed. For several years prior to the patent, ethyl chloride was administered from so-called sealed tubes; that is, tubes of glass drawn to a slender neck, which is sealed to contain safely the liquid while stored prior to use, and, when needed for an operation, requiring to be broken off at a file mark to permit the liquid to escape in a hairlike jet from the minute capillary orifice of the slender neck. After breaking the neck and using the liquid for one operation, there usually remained sufficient liquid to perform several additional operations, and efforts were made to save this residue of liquid for future use. One means employed was by placing a stretched rubber band around the tube, end for end; but it was found that the

sharp edges of the broken glass neck would usually cut the rubber, and in any case its closure was not sufficiently tight to prevent evaporation. Another plan was to put a rubber cap over the neck, but this did not have strength enough to resist the internal pressure, and sometimes the rubber was dissolved by the fluid. Another serious difficulty arose from the fact that the slender neck had to be broken or snapped off at a particular place, indicated by a file mark. This was not always feasible, and often a breakage of the entire tube resulted; and, even when it was effective, small splinters of glass were scattered about the patient to be operated upon. Coincident with this breakage there was often a great and unnecessary leakage of fluid before the stream could be directed on the surface to be anæsthetized, because a sharp, cutting edge of glass would prevent the occlusion of the capillary opening by the finger. Again, if the tube were not broken precisely level with the file mark, the spray did not issue in the desired form.

The record shows that attempts to improve on these old sealed tubes were made by a Frenchman—one Bengué—who apparently manufactures the alleged infringing devices which defendants sell here, and who took out patents in France and in this country, which have been put in evidence, but apparently are not much relied upon in argument. In one of Bengué's devices the arrangements for opening and closing resemble those of the patent in suit. It is not necessary to break the neck. The orifice is closed by a cap, which swings off when a spring which holds it in place is drawn back. There is nothing in the record to show whether or not this device of Bengué's was practical and efficient. The details of its structure are not very clearly indicated, but the experts for both sides concur in the statement that in the patent in suit the capillary opening is made by contracting the neck, while in the Bengué French patent it is produced by securing a piece of capillary glass tube in the neck. This apparently would be fitted into place by grinding, and afterwards secured by some suitable cement. Such a two-part neck would be more expensive to manufacture, and is easily differentiated from the integral neck of the patent in suit. No one testifies to the operation of a tube so constructed, but it is suggested that the inserted plug would be liable to become uncemented, and to be blown out by internal pressure when the cap is unscrewed. Another patent to Bengué (558,762) shows a tube with caps substantially Monnet's, but with a neck which had to be broken before the cap is app'ied. The patent is subsequent in date of application to Monnet's, and need not be discussed. The prior art discloses no closer anticipations than these various tubes of Bengué. Defendant has introduced some statements as to ethyl chloride tubes contained in different numbers of a publication called the "Dental Cosmos," but they are too vague and indefinite to make out an anticipation of the integral neck pierced with capillary outlet of the patent in suit, which seems to be an improvement not worked out by any one before Monnet, and which has superseded earlier forms.

Defendants' main reliance appears to be on certain instruments known as "pycnometers." They are laboratory devices for determining the specific gravity of highly volatile liquids. They are instruments of a different art. It is, no doubt, true, as held by this court in Briggs v. Duell, 93 Fed. 974, 36 C. C. A. 38, following many other decisions on the subject of "double use," that, when a particular device is used in one art to accomplish a specific purpose, it is not invention to transfer the same device to another art, and there employ it to accomplish a similar purpose. But in the pycnometers there is no such adaptation of means to ends. When they are filled and are held too long in the hand, a jet of the liquid will be discharged from a capillary orifice, but that is a defect of the instrument. Its various parts were combined for no such purpose. An ether pipette, which is also relied upon, is adapted for ejecting volatile liquid when heated by the hand, but is not equipped for storing the liquid. The specification points out the difference between the device of the patent and the various forms of dropping bottles which operate by gravity.

There is no complete anticipation, and although, in view of the prior devices of the art, the improvement is not a great one, it exhibits patentable novelty. Of the claims declared upon, the first, seventh, and eighth do not enumerate the integral neck as an element. The fourth is somewhat ambiguous. It includes an integral neck, but defendants contend that its language is not broad enough to cover a vessel with two necks. That question need not now be decided, since the sixth claim covers two integral necks, and the defendants' device is clearly within its terms.

Complainants may take the usual decree under the sixth claim.